**GRAND RAPIDS AUTO SALES, INC., Plaintiff,**

v.

**MBNA AMERICA BANK, National Association, Defendant.**

Case No. 1:01–CV–660.

United States District Court, W.D. Michigan, Southern Division.

July 24, 2002.

John E. Anding, Christopher G. Hastings, Drew, Cooper & Anding, Charles S. Rominger, Dilley & Rominger, Grand Rapids, MI, for Plaintiff.

Mary Patricia Cauley, Plunkett & Cooney, PC, Bloomfield Hills, MI, for Defendant.

## *OPINION*

QUIST, District Judge.

Plaintiff, Grand Rapids Auto Sales, Inc. ("GRAS"), has sued Defendant, MBNA America Bank, N.A. ("MBNA"), alleging state law claims for breach of a common law duty of inquiry and conversion arising out of MBNA's receipt of checks written by a former GRAS employee and drawn on GRAS' account in payment for the employee's husband's credit card debt to MBNA. Now before the Court are GRAS' motion

for judgment on the pleadings and MBNA's motion for summary judgment and/or motion for dismissal. For the reasons stated below, the Court will grant MBNA's motion and dismiss the case.

### Facts

GRAS is a Michigan corporation engaged in the business of buying and selling cars. Between 1997 and 2000, Katrina Stewart ("Stewart") was employed as a manager by GRAS. During that period, Stewart wrote checks, without authority, on GRAS' corporate account payable to MBNA and sent them to MBNA for payment of her husband's MBNA credit card account. MBNA accepted the checks credited the proceeds to Stewart's husband's credit card debt.

MBNA accepted and processed the GRAS checks in its normal manner, through electronic processing. When MBNA receives a check for a credit card payment, the envelope containing the check and the payment slip is opened by machine and the check and the payment slip are electronically processed and credited to the card holder's account balance. (Carey Aff. ¶ 2, Def.'s Br. Supp.) MBNA does not normally review checks for credit card payments. (*Id.* ¶ 3.) After crediting a payment check to the card holder's account, MBNA transfers it to the bank on which it is written for collection. (*Id.* ¶ 6.) Pursuant to its standard practice, MBNA did not review the checks it received from Stewart. (*Id.* ¶ 5.) GRAS did not have a customer relationship with MBNA during the relevant time period. (*Id.* ¶ 13.)

### Motion Standard

Although GRAS initially moved for judgment on the pleadings pursuant to Fed. R.Civ.P. 12(c), the Court will treat the motions as cross motions for summary judgment because both parties have submitted matters outside the pleadings. Fed.R.Civ.P. 12(c); *EEOC v. J.H. Routh*

*Packing Co.*, 246 F.3d 850, 855 n. 1 (6th Cir.2001). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### Discussion

At the Rule 16 scheduling conference, the Court directed the parties to brief the issue of whether MBNA has a duty of inquiry to GRAS under the circumstances in this case. The Court and the parties agreed that resolution of this issue would help to narrow the issues and focus or limit the scope of discovery. GRAS limits it motion to the sole issue of whether MBNA owed a duty of inquiry to GRAS. While MBNA also addresses the duty of inquiry in its motion, MBNA raises the additional issues of whether: (1) it was a holder in due course; (2) it is liable for conversion; and (3) certain checks are outside the three-year limitations period. The Court will first address the main issue in contention—whether MBNA owed a duty of inquiry to GRAS.

## I. Duty of Inquiry[1]

GRAS cites *Allis Chalmers Leasing Services Corp. v. Byron Center State Bank,* 129 Mich.App. 602, 341 N.W.2d 837 (1983)(per curiam), as the principal authority for its claim that MBNA owed it a duty of inquiry. In that case, the Michigan Court of Appeals held that the defendant bank breached its duty owed to the plaintiff to inquire regarding the application of the proceeds of a check written by the plaintiff to the bank and presented to the bank by a third party. The plaintiff had agreed to purchase three vehicles Breton Shell used in its business and then lease those vehicles back to Breton Shell. The defendant bank either held title to or a security interest in the vehicles. A bank officer had informed representatives of the plaintiff that the bank might have a security interest in the vehicles and was aware that the plaintiff might be giving Breton Shell checks to purchase the vehicles or pay off the liens. The plaintiff gave Deneen, a representative of Breton Shell, a check which Deneen was to use to purchase the vehicles from the bank. Rather than purchasing the vehicles, Deneen instructed the bank to apply the proceeds from the check to various existing obligations of Deneen and Breton Shell to the bank. Consequently, the titles to the vehicles were never transferred to the plaintiff, and the plaintiff never received any lease payments. The court held that the following rule applied:

> "Where a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer; it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the au-

thority of the drawer's agent to receive payment."

*Id.* at 606, 341 N.W.2d at 839 (quoting 9 C.J.S. § 340 (1955)). The court held that under this rule, the bank was obligated to inquire of the plaintiff regarding how the proceeds should be applied. *Id.* at 607, 341 N.W.2d 837, 129 Mich.App. at 840, 342 N.W.2d 619. Adopting the reasoning of the California Supreme Court in *Sun 'N Sand, Inc. v. United California Bank,* 21 Cal.3d 671, 582 P.2d 920, 937 (1978), the court also rejected the bank's contention that it was relieved from liability because it was a holder in due course. In *Sun 'N Sand,* an employee of Sun 'N Sand presented a number of checks drawn on Sun 'N Sand's account to the defendant bank. The checks, which had been altered by the employee to increase the amount, were made payable to the bank. The bank deposited the checks in the employee's account pursuant to her instructions. The trial court dismissed Sun 'N Sand's negligence claim against the bank on the basis that the bank was a holder in due course. The California Supreme Court reversed because the bank had adequate notice to preclude holder in due course status. The court stated:

> "We hold simply that the bank may not ignore the danger signals inherent in such an attempted negotiation. There must be objective indicia from which the bank could reasonably conclude that the party presenting the check is authorized to transact in the manner proposed. In the absence of such indicia the bank pays at its peril.... While it may be less difficult for the employer to prevent the issuance of such checks than for the bank to detect that an indorsement is forged, this is not the relevant compari-

---

1. Although the parties cite cases from jurisdictions other than Michigan, the Court need not address the choice of law issue because the parties both agree that Michigan law applies in this case.

son when the bank is presented with checks naming it as payee. In the latter circumstance the bank is confronted with an obvious irregularity when the drawer's dishonest employee attempts to negotiate such checks for his own benefit. The bank does not have to be especially vigilant; its agent need only read what appears on the face of the check to be warned that a fraud may be in progress."

*Allis Chalmers*, 129 Mich.App. at 608–09, 341 N.W.2d at 840 (quoting *Sun 'N Sand*, 21 Cal.3d at 695–96, 148 Cal.Rptr. 329, 582 P.2d at 937). Employing the *Sun 'N Sand* standard, the Michigan court held that the bank had sufficient notice to deprive it of holder in due course status because the plaintiff had inquired of the bank whether the bank had title to, or a security interest in, the three vehicles; the bank officer was aware that the plaintiff was giving Deneen checks for the purchase of certain vehicles; and the cashier's check contained the notation: "Payment of invoice for Wreckers Leased to Breton Shell, Inc." *Id.* at 609, 148 Cal.Rptr. 329, 582 P.2d 920, 341 N.W.2d at 840–41.

MBNA contends that the rule applied in *Allis Chalmers* is inapplicable in this case for two reasons. First, it contends that the rule does not apply because MBNA received the checks for credit card payments rather than a bank deposit. Second, it contends that it had no duty to inquire of GRAS because such a duty arises only in the context of a banking relationship, which did not exist in this case. With regard to the latter issue— whether a banking relationship is required to support a duty of inquiry—both parties have cited cases which support their respective positions. For example, GRAS correctly notes that there was no indication in *Allis Chalmers* that the plaintiff had a banking relationship with the defendant bank. Similarly, there is no indica-

tion in *Sun 'N Sand,* the case relied upon by the *Allis Chalmers* court, that a depositary relationship existed between Sun 'N Sand and United California Bank. *See Sun 'N Sand,* 21 Cal.3d at 693, 148 Cal.Rptr. 329, 582 P.2d at 935 (stating that "[w]e need not consider whether a special relationship exists between a collecting bank and the drawer of a check"). Also providing support for GRAS' argument are *Kaiser–Georgetown Community Health Plan, Inc. v. Bankers Trust Co. of Albany, N.A.,* 110 Misc.2d 320, 442 N.Y.S.2d 48 (1981), and *Arvada Hardwood Floor Co. v. James,* 638 P.2d 828 (Colo.App.1981), in which the courts applied the rule expressed in *Allis Chalmers* and *Sun 'N Sand* in favor of plaintiff-drawers who did not have banking relationships with the defendant banks. *See also Pettigrew v. Citizens Trust Bank,* 229 B.R. 39, 40–41 (N.D.Ga.1998)(noting that the drawer did not have a "business relationship with the bank and was not indebted to it" and that the bank's duty to inquire of the drawer regarding the bearer's authority "arises out of the existence of a foreseeable risk of harm, namely the possibility of misappropriation of the moneys by the bearer of the check"); *Progressive Cas. Ins. Co. v. PNC Bank, N.A.,* No. Civ. A. 98–6840, 1999 WL 557292, at *9 (W.D.Pa. July 26, 1999)(rejecting the bank's assertion that under Pennsylvania law a bank does not owe duties to a party with whom it does not have a banking relationship); *cf. Third Nat'l Bank & Trust Co. v. Diamond Sav. & Loan Co.,* 43 Ohio App.3d 140, 144–45, 540 N.E.2d 272, 276–77 (1987)(applying the reasoning of *Sun 'N Sand* to claim by a payor bank against a depositary bank). On the other hand, MBNA has cited several cases supporting its position that a depositary bank's duty to inquire arises out of the contractual banking relationship between a bank and its customer. *See Mut. Serv.*

*Cas. Ins. Co. v. Elizabeth State Bank,* 265 F.3d 601, 613–14 (7th Cir.2001)(noting that the duty to inquire "derives from the position of trust that the bank occupies with respect to funds that it has invited its customers to place in its custody"); *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.,* 49 Cal.App.4th 472, 479, 56 Cal.Rptr.2d 756, 760 (1996)(stating that "[r]ecent cases have held that absent extraordinary and specific facts, a bank does not owe a duty of care to a noncustomer"); *Karen Kane, Inc. v. Bank of Am. Nat'l Trust & Sav. Ass'n, Inc.,* 67 Cal.App.4th 1192, 1202, 79 Cal.Rptr.2d 712, 718 (1998)(same). The Court finds it unnecessary to resolve this issue, however, because it concludes that regardless of whether a banking relationship is required, a bank does not have a duty to inquire under the circumstances in this case.

The parameters of a bank's duty to inquire were outlined by the court in *Sun 'N Sand:*

> The duty is narrowly circumscribed: it is activated only when checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit. Moreover, the bank's obligation is minimal. We hold simply that the bank may not ignore the danger signals inherent in such an attempted negotiation. There must be objective indicia from which the bank could reasonably conclude that the party presenting the check is authorized to transact in the manner proposed. In the absence of such indicia the bank pays at its peril.

*Sun 'N Sand,* 21 Cal.3d at 695–96, 148 Cal.Rptr. 329, 582 P.2d at 937. As indicated, the duty arises only in circumstances where the check is physically presented to the bank for negotiation by the dishonest employee and the bank, through its agent, has the opportunity to inspect the check for irregularities that should alert the bank that fraud is amiss. These were the circumstances in all of the cases cited above. In holding that the bank had a duty to inquire, the *Sun 'N Sand* court rejected the bank's assertion that a duty of inquiry would be excessively burdensome. The court reasoned that under the circumstances, the bank should have reasonably foreseen Sun 'N Sand's loss through misappropriation by the dishonest employee. *Id.* at 695, 148 Cal.Rptr. 329, 582 P.2d at 936–37.

GRAS has not cited, nor has the Court found, any case extending the duty of inquiry to a situation such as this where a bank receives a check in payment for a credit card account. The Court declines to extend such a duty to the checks MBNA received because it would be inconsistent with the policy considerations generally applicable to the determination of a duty in negligence cases. Those considerations include

> foreseeability of the harm, existence of a relationship between the parties involved, degree of certainty of injury, closeness of connection between the conduct and the injury, moral blame attached to the conduct, policy of preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach.

*Krass v. Tri–County Sec., Inc.,* 233 Mich. App. 661, 668–69, 593 N.W.2d 578, 582 (1999).

The key distinction between this case and *Sun 'N Sand* and *Allis Chalmers* is that the banks in those cases actually inspected the checks and should have been alerted by the circumstances—a check drawn payable to the order of the bank by a drawer not indebted to the bank and presented by a third party seeking to negotiate the check for his own benefit—that

the employee's conduct may have been improper. In other words, suspicious circumstances on the face of the checks should have alerted the banks to the potential for loss to the drawer.[2] In contrast, pursuant to its standard procedure, MBNA processed the GRAS checks without examining them. (Carey Aff. ¶¶ 2, 3, 5.) Thus, MBNA was not aware of any suspicious circumstances and could not have foreseen or prevented harm to GRAS.

■ GRAS contends that the fact that MBNA uses automated processing should not excuse it from inspecting checks received for credit card payments because MBNA is still required to meet its obligations under the law. This argument puts the cart before the horse, however, because it assumes that MBNA is obligated to physically examine every single check it receives for a credit card payment, regardless of whether it uses automated processing. Apart from the fact that GRAS has not cited any law imposing such a requirement, requiring a bank to physically inspect each check received for a credit card payment would not only impose a severe and unnecessary burden on banks that use automated processing, but would produce negative consequences for consumers and the banking industry in general and would be contrary to law. MBNA receives and processes an average of 500,000 credit card payments per day. (*Id.* ¶ 4, 341 N.W.2d 837.) In order to inspect each of those payments, MBNA would be required to hire many new employees, resulting in increased costs to MBNA and, ultimately, an increase in the cost of credit to the consumer. An inspection requirement would also impede the efficiency of the banking process by increasing the amount of time between banks for settlement or dishonoring of checks. Moreover, such a requirement would be contrary to the Uniform Commercial Code's ("UCC") recognition that automated processing of checks and other items, without inspection, is commercially reasonable. With regard to banks, UCC § 3–103(a)(7), M.C.L. § 440.3103(1)(g), which defines "ordinary care," states:

> In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this article or article 4.

M.C.L. § 440.3103(1)(g). *See generally* 2 J. White & R. summers, *Uniform Commercial Code*, § 19–3 at 251–52 (4th ed.1995)(stating that "the last sentence of 3–103(a)(7) addresses electronic and mechanical dealing with checks and with data from checks, but it does nothing to protect a bank that deals face-to-face with the embezzler").

Imposing a duty upon MBNA would also result in shifting the risk of loss from the party in the best position to discover the loss to the party least likely to discover it. GRAS could have protected itself by examining its returned checks or its monthly bank statements over the course of the twenty-one month period during which Stewart sent the GRAS checks to MBNA. M.C.L. § 440.4406; *Gino's of Capri, Inc. v. Chem. Bank, N.A.*, 187 A.D.2d 71, 76, 592

---

2. As noted in the discussion above, the bank in *Allis Chalmers* also had notice from conversations with the plaintiff's representative that the plaintiff intended the check for a specific purpose but the bank allowed the third party to apply the proceeds in a different manner. There are no similar facts in this case.

N.Y.S.2d 682, 685 (1993); *Amzee Corp. v. Comerica Bank–Midwest*, 2002 WL 1012998, at *10 (Ohio App.2002). Moreover, GRAS could have put in place security or screening measures or bonding to protect against employee theft and dishonesty. None of these means were available to MBNA.

Finally, imposing a duty of inquiry on banks for checks received in payment of credit card debts would not necessarily prevent loss through employee misconduct because, as other courts have recognized, there are legitimate reasons for an employer's payment of an employee's credit card debt. *United Catholic Parish Schs. of Beaver Dam Educ. Ass'n v. Card Servs. Ctr.*, 248 Wis.2d 463, 474, 636 N.W.2d 206, 211 (Wis.Ct.App.2001). In *Hartford Accident & Indemnity Co. v. American Express Co.*, 74 N.Y.2d 153, 544 N.Y.S.2d 573, 542 N.E.2d 1090 (1989), the court observed:

> [T]he use of corporate checks to pay employees' debts "is an every day occurrence in the business world. Employers often help an employee to maintain a residence as an inducement to continued employment in an area where living expenses are high. Employers often pay for the entertainment of customers by an employee. Employers often pay for travel and transportation expenses of an employee."

*Id.* at 163, 544 N.Y.S.2d 573, 542 N.E.2d at 1095 (internal quotations omitted)(quoting lower court). In light of this reality, it would be unreasonable to impose on a bank a duty to inquire whenever it receives a check for payment of a credit card debt drawn on the account of someone other than the credit card holder.

## II. MBNA's Holder in Due Course Status

MBNA argues that it is a holder in due course and is therefore entitled to summary judgment on all of GRAS' claims. UCC Section 3–306 provides:

> A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds. A person having rights of a holder in due course takes free of the claim to the instrument.

M.C.L. § 440.3306. A holder is a holder in due course if the instrument does not bear evidence of forgery or alteration and the holder takes the instrument:

> (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an incurred default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in section 3306, and (vi) without notice that any party has a defense or claim in recoupment described in section 3305(1).

M.C.L. § 440.3302(1)(b).

MBNA meets all of these requirements with regard to the GRAS checks. First, there is no evidence that a forgery or alteration was apparent from the face of the checks.[3] Second, MBNA

---

**3.** There is no dispute that the checks were negotiable instruments or that MBNA was a "holder" of the checks. A negotiable instrument is defined as "an unconditional promise or order to pay a fixed amount of money" if the following conditions are met:

> (a) It is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

took the checks "for value," even though GRAS did not receive the value. An instrument is transferred for value if it "is issued or transferred as payment of . . . an antecedent claim against any person." M.C.L. § 440.3303(1)(c). Here, the checks were issued to MBNA as payment for the antecedent debt of Stewart's husband. Third, MBNA took the checks in "good faith." "Good faith" is defined as "honesty in fact in the conduct or transaction concerned." M.C.L. 440.1201(19). As discussed above, MBNA processes checks received for credit card payments electronically without manually examining them. Because the UCC recognizes automated processing as a commercially reasonable practice common in the banking industry, MBNA is entitled to rely solely on this method without examining each check. In addition, given the large volume of payments MBNA processes each day, it would be unreasonable to require MBNA to examine each check it receives. Furthermore, as mentioned above, even if MBNA actually reviewed each check as part of its regular procedure, MBNA would still act in good faith by accepting the GRAS checks because there are a number of legitimate reasons why an employer may pay the credit card debt of its employee. Fourth, there is no evidence that MBNA took the GRAS checks with actual or constructive notice that they contained an unauthorized signature or that they were subject to a claim described in UCC § 3–306. GRAS attempts to defeat MBNA's holder in due course status through its claims that MBNA had a duty to inquire of GRAS regarding Stewart's authority to negotiate the checks in payment of her husband's credit card debt and that MBNA had notice of a breach of fiduciary duty by Stewart. GRAS' claim that MBNA had a duty to inquire must be rejected for the reasons set forth above. GRAS' claim that MBNA had notice of a breach of fiduciary duty by Stewart also fails because there is no evidence that MBNA had knowledge that Stewart was a fiduciary of GRAS or of a breach of fiduciary duty by Stewart. The rules for determining whether a person taking an instrument has notice of the claim of a represented person that its fiduciary has committed a breach of fiduciary duty are set forth in UCC § 3–307. That section provides, in part:

> (2) If (i) an instrument is taken from a fiduciary for payment or collection or for value, (ii) the taker has knowledge of the fiduciary status of the fiduciary, and (iii) the represented person makes a claim to the instrument or its proceeds on the basis that the transaction of the fiduciary is a breach of fiduciary duty, the following rules apply:

> (a) Notice of breach of fiduciary duty by the fiduciary is notice of the claim of the represented person.

> \* \* \* \*

> (d) If an instrument is issued by the represented person or the fiduciary as such, to the taker as payee, the taker has notice of the breach of fiduciary duty if the instrument is (i) taken in payment of or as security for a debt known by the taker to be the personal

(b) It is payable on demand or at a definite time.
(c) It does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money. . . .
M.C.L. § 440.3104(1). The checks met all of these requirements. A "holder . . . means the

person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession." M.C.L. § 440.1201(20). MBNA was a holder because the GRAS checks were payable to MBNA.

debt of the fiduciary, (ii) taken in a transaction known by the taker to be for the personal benefit of the fiduciary, or (iii) deposited to an account other than an account of the fiduciary, as such, or an account of the represented person. M.C.L. § 440.3307(2). Assuming for purposes of this motion that Stewart qualifies as a fiduciary, *see* M.C.L. § 440.3307(1)(a), GRAS cannot show that MBNA had notice either of Stewart's fiduciary status or of her breach of fiduciary duty. Notice of a person's fiduciary status or of the fiduciary's breach of her duties satisfies § 3–307 only if it amounts to knowledge. *See* M.C.L. § 440.3307(2)(b) cmt. 2; *Progressive Cas. Ins. Co.*, 1999 WL 557292, at \*3. Because MBNA opened and processed the credit card payments electronically without actually examining the checks, there is no evidentiary basis to establish these requirements.

### III. Conversion Claim

■ Count II of GRAS' First Amended Complaint alleges a claim for conversion of the funds represented by the checks. This claim also incorporates GRAS' assertion that MBNA had notice of Stewart's breach of fiduciary duty. The conversion claim must be dismissed to the extent it relies upon MBNA's alleged notice of Stewart's breach of fiduciary duty for the reasons set forth above. The claim also fails apart from those allegations because "the drawer of the check may not maintain an action for conversion, because the check represents an obligation of the drawer rather than property of the drawer." *Pamar Enters., Inc. v. First State Bank of E. Detroit*, 228 Mich.App. 727, 735, 580 N.W.2d 11, 15–16 (1998)(citing M.C.L.

§ 440.3420(1)). GRAS, as the drawer of the checks, is precluded from maintaining a conversion claim. GRAS attempts to avoid this rule by arguing that its claim is for conversion of the proceeds of the checks rather than the checks themselves. This argument must be rejected because the UCC does not draw a distinction between checks and the proceeds received from the checks. *Amzee Corp.*, 2002 WL 1012998, at \*10. Moreover, as a holder in due course, MBNA took the checks free of all claims, including any claim for conversion.[4] *United Catholic Parish Sch.*, 248 Wis.2d at 472, 636 N.W.2d at 210.

### IV. Conclusion

For the foregoing reasons, the Court will grant MBNA's motion for summary judgment and deny GRAS' motion for judgment on the pleadings.

An Order consistent with this Opinion will be entered.

### ORDER

In accordance with the Opinion filed this date,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment and/or Motion for Dismissal (docket no. 26) is **GRANTED** and Plaintiff's First Amended Complaint is **DISMISSED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Judgment on the Pleadings (docket no. 22) is **DENIED.** .

This case is **closed.**

---

4. GRAS contends that the Court should allow its conversion claim because it is similar to conversion claims allowed in *Douglass v. Wones*, 120 Ill.App.3d 36, 76 Ill.Dec. 114, 458 N.E.2d 514 (1983), and *PWA Farms, Inc. v. N.*

*Platte State Bank*, 220 Neb. 516, 371 N.W.2d 102 (1985). Those cases do not help GRAS because, unlike MBNA in this case, the defendants in those cases were not holders in due course.