No. 91,069

MID-CONTINENT SPECIALISTS, INC., *Appellant*, v.
CAPITAL HOMES, L.C., *Appellee*.

106 P.3d 483

Opinion filed February 18, 2005.

*Chris J. Sherman*, of Payne & Jones, Chartered, of Overland Park, argued the cause, and *J. Tyler Peters*, of the same firm, was with him on the brief for appellant.

*Bruce F. Landeck*, of Overland Park, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Mid-Continent Specialists, Inc. (Mid-Continent) sued Capital Homes, L.C. (Capital Homes) for conversion based on a $50,000 check to Capital Homes written on Mid-Continent's cor-

porate bank account by Mid-Continent employee Lynn Smith for her personal debt. After a bench trial, the court held that K.S.A. 84-3-420(a) barred Mid-Continent from suing for conversion as a matter of law. Mid-Continent appealed, and the case was transferred to this court pursuant to K.S.A. 20-3018(c).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Does K.S.A. 84-3-420(a) bar Mid-Continent's cause of action for conversion of the check? Yes.

2. Does K.S.A. 84-3-420(a) bar Mid-Continent's cause of action for conversion of the check when its representative merely acted outside the scope of her authority? Yes.

3. Does Mid-Continent have a separate, valid claim for conversion of the $50,000 in its bank account? No.

Accordingly, the judgment of the trial court is affirmed.

## FACTS

Defendant Capital Homes, Inc. has been building custom residential homes since 1997. Effective August 16, 2001, Capital Homes, as Seller, and Harry J. and/or Joyce Lynn Smith, as Buyers, entered into a written Residential New Construction Sale Contract. This contract provided that Capital Homes would build a custom home for the Smiths in Valley Brooke Estates, Stilwell, Kansas, for the price of $688,000 (excluding cost of lot). Mrs. Smith told David Broockerd, owner and member of Capital Homes, that she would purchase the 7-acre lot upon which this home would be built and would provide a warranty deed to Capital Homes.

After the August 16, 2001, contract was executed, Smith advised Broockerd that she had purchased the subject lot for $155,000 and that it still had an approximate $110,000 mortgage against it. After learning of this mortgage, Broockerd advised her that the August 16, 2001, contract for the construction of the "home only" could not be closed. He also advised that Capital Homes would have to purchase the lot and pay off the mortgage; that the parties would need to enter into a second sales contract; and that the Smiths would need to pay a nonrefundable earnest deposit of $50,000.

On November 14, 2001, Broockerd and Smith met, and she delivered a check in the amount of $50,000 as the nonrefundable earnest deposit. The check was a Mid-Continent Specialists, Inc. business check drawn on the Hillcrest Bank, payable to "Capital Homes" and signed "J. Lynn Smith."

Broockerd knew that Mid-Continent, a business concentrating on residential construction and roofing, was not a party to the sales contract. In delivering this check, Smith told Broockerd that, although the check was drawn on Mid-Continent's corporate account, the $50,000 proceeds were from an unpaid company draw that was due her for the year 2000. Smith had previously told Broockerd that she was a partner in Mid-Continent. Broockerd endorsed the check in the name of Capital Homes and deposited it in the corporate account at Valley View Bank on November 16, 2001.

Almost immediately after depositing the earnest check, Capital Homes commenced its construction work.

On about November 28, 2001, Capital Homes and the Smiths entered into a second Residential New Construction Sale Contract, which contained the written requirement for the $50,000 nonrefundable earnest deposit — previously paid on November 14 — and a new construction price of $844,761.18 (including now the lot purchased by Capital Homes). As the parties had previously agreed, Capital Homes paid off the Smiths' existing lot mortgage. Capital Homes continued its construction process, and on December 10, 2001, secured a construction loan for $646,566.

In the last week of December 2001, Broockerd received a phone call from Tony Evans, Mid-Continent's president, who advised Capital Homes not to do further construction work on the Smith house because there was something "funny" going on with the Mid-Continent books. Mid-Continent had first learned that Smith was embezzling company funds around mid-December 2001. Capital Homes quit construction work when it learned of the embezzlement and listed the lot for sale in early 2002 for $135,500. In mid-January 2002, Mid-Continent's Greg Prieb called Broockerd and demanded the $50,000 check be returned to Mid-Continent.

On February 1, 2002, Capital Homes received a letter from Smith's attorney, asking Capital Homes to return all the money that it had received from her. On March 28, 2002, Capital Homes also received a letter from Mid-Continent's attorney demanding that it repay the money to Mid-Continent. As of the date of oral arguments, Capital Homes had not turned over any of the monies received from Smith, an amount totaling $55,000. Nor had Mid-Continent received repayment of the $50,000 from Capital Homes, its representative Broockerd, or Smith.

Smith was not employed directly by Mid-Continent, but as a bookkeeper by an accounting firm that did accounting services for Mid-Continent. She was not entitled to a $50,000 draw or bonus or return of any equity in the 2001 time frame. While she had check-writing authority up to $50,000 for Mid-Continent's business purposes, she did not have authority to write checks for her personal debts. She later was determined to have embezzled $800,000 from Mid-Continent during 2000 and 2001.

Mid-Continent did not file any legal action against Smith for recovery of money because she was judgment proof. Mid-Continent was waiting for the attorney general to file criminal charges against her, so it could recover from the Kansas Crime Victims Compensation Fund. In the meantime, Mid-Continent brought the present suit against Capital Homes for conversion of the $50,000.

After a trial to the court on May 5, 2003, it issued its memorandum decision on May 28, 2003. The court rejected Capital Homes' defense as a holder in due course under K.S.A. 84-3-302 but, after accepting the argument that K.S.A. 84-3-420(a) barred Mid-Continent's claim, granted judgment for Capital Homes.

Mid-Continent filed a motion to alter or amend the judgment, which the trial court denied in its memorandum decision of June 30, 2003.

## ANALYSIS

Issue 1: *Does K.S.A. 84-3-420(a) bar Mid-Continent's cause of action for conversion of the check?*

Mid-Continent argues that the trial court erred in holding K.S.A. 84-3-420(a) bars the conversion cause of action. Capital Homes

responds that the clear language of the statute, as well as the Official UCC and Kansas Comments, support the trial court's holding. The interpretation of the Uniform Commercial Code is a question of law over which this court has unlimited review. *King v. White,* 265 Kan. 627, 632, 962 P.2d 475 (1998).

Mid-Continent further argues that the trial court erred in even considering K.S.A. 84-3-420(a) because this affirmative defense had been raised too late and was therefore waived. Capital Homes responds that 84-3-420(a) is not an affirmative defense and, even if so, Mid-Continent failed to object to the defense's late assertion and cannot raise such an objection for the first time on appeal. As discussed below, their disagreement is more accurately characterized as whether Mid-Continent has standing to bring the conversion action. Whether a party has standing to sue is a question of law subject to unlimited review. *312 Education Ass'n v. U.S.D. No. 312,* 273 Kan. 875, 882, 47 P.3d 383 (2002).

Although the issue of standing is typically a threshold consideration, it cannot be clearly analyzed without first reviewing K.S.A. 84-3-420(a) and some of its interpretive case law.

### *The statutory bar*

K.S.A. 84-3-420(a) states:

"The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. *An action for conversion of an instrument may not be brought by (1) the issuer or acceptor of the instrument* or (2) a payee or endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a copayee." (Emphasis added.)

The UCC Official Comment explains that "[t]here is no reason why a drawer should have an action in conversion. The check represents an obligation of the drawer rather than property of the drawer."

In a similar fashion, the 1996 Kansas Comment states: "Plaintiffs are generally restricted to the persons to whom the instrument is payable and who have received the instrument. *The maker or drawer of the instrument is not a proper plaintiff,* nor is the payee

of an instrument which is not delivered. This is a codification of prior decisions." (Emphasis added.) K.S.A. 84-3-420, Kansas Comment, 1996, subsection (a).

Here, Mid-Continent is the drawer, maker, or issuer. K.S.A. 84-3-103(3) (drawer is person who signs or is identified in a draft as a person ordering payment); K.S.A. 84-3-103(5) (maker is person who signs or is identified in a note as a person undertaking to pay); K.S.A. 84-3-105(c) (issuer means a maker or drawer of an instrument). Hillcrest Bank is the drawee or payor. K.S.A. 84-3-103(2) (drawee means a person ordered in a draft to make payment); K.S.A. 84-4-105(3) (payor bank is the bank that is the drawee in a draft). Capital Homes is the payee. See Black's Law Dictionary 1129 (6th ed. 1990) (payee is the person in whose favor a bill of exchange, promissory note, or check is made or drawn; the person to whom or to whose order a bill, note, or check is made payable; the person to whom an instrument is payable upon issuance).

The language of the statute is clear; as an "issuer of the instrument," Mid-Continent has no cause of action for its conversion. *Grand Rapids Auto Sales, Inc. v. MBNA America Bank,* 227 F. Supp. 2d 721 (W.D. Mich. 2002), is on point. There, plaintiff's managerial employee wrote checks on plaintiff's corporate account to defendant bank for 3 years in payment of her husband's personal credit card debt with the bank. The bank accepted the checks and credited the proceeds to the husband's credit card debt. The plaintiff brought suit for, among other things, conversion of the funds. The court granted the bank's motion for summary judgment, and, citing § 3-420, held:

"The [conversion] claim also fails . . . because 'the drawer of the check may not maintain action for conversion, because the check represents an obligation of the drawer rather than property of the drawer.' *Pamar Enters. Inc. v. First State Bank of E. Detroit,* 228 Mich. App. 727, 735, 580 N.W.2d 11, 15-16 (1998) (citing M.C.L. § 440.3420[1]). GRAS, as the drawer of the checks, is precluded from maintaining a conversion claim." 227 F. Supp. 2d at 730.

See also *Continental Cas. Co. v. American Nat'l Bk.,* 329 Ill. App. 686, 697, 768 N.E.2d 352 (2002) (Section 3-420[a] is inapplicable because under this section the issuer of the instrument cannot bring an action for conversion of the instrument.); *IBP, Inc. v.*

*Mercantile Bank of Topeka*, 6 F. Supp. 2d 1258 (D. Kan. 1998) (Drawer IBP acknowledged that it had no valid claim for statutory conversion under the UCC because of K.S.A. 84-3-420[a]: "The rationale for precluding a drawer from maintaining a statutory conversion action is that '[t]he check represents an *obligation* of the drawer rather than the *property* of the drawer.' ").

The trial court correctly held that K.S.A. 84-3-420(a) barred Mid-Continent's conversion action.

*Standing*

We start our analysis by noting that according to the documents in the record on appeal, the first time that Capital Homes mentioned K.S.A. 84-3-420(a) in this litigation was during its closing argument to the court after the presentation of evidence on May 5, 2003. The transcript reveals:

"[Defense Counsel]: As to looking through Mr. Broockard's eyes, he doesn't have any reason to disbelieve that lady when she gives him the check and says it's for her earnest deposit, particularly given her explanation. *And of course, there are some sections in this code that I've looked at that bring into my mind the question of whether a conversion action can even be maintained by this plaintiff. I know there is a section that talks about conversion being a proper action in certain instances and plaintiff cited that in their trial brief,* [K.S.A.] *84-3-420.*

"But if you look at the Kansas comment to that section, what it says in part is that *plaintiffs are generally restricted to the persons to whom the instrument is payable and who have received the instrument. And so if that's true, then this plaintiff isn't a proper party to maintain a conversion action under the Uniform Commercial Code as I read that.* And again, I'm not purporting to be an expert.

"THE COURT: I do believe that this check was a negotiable instrument, and it's going to be covered under the law of negotiable instruments. It's a check.

"[Plaintiff's Counsel]: That was my feeling too."

According to the documents in the record on appeal, the first time that Mid-Continent objected to the assertion of 84-3-420 was in its motion to alter or amend where it argued the statute constituted an affirmative defense as contemplated by K.S.A. 2004 Supp. 60-208(c) and should have been pled or raised well before closing argument. Accordingly, Mid-Continent argued Capital Homes had waived its right to rely on the defense. Capital Homes responded that Mid-Continent had not timely objected and essentially had "waived its right to argue waiver" because of the contemporaneous

objection rule, citing *Welch v. State*, 270 Kan. 229, 233, 13 P.3d 882 (2000). It also renewed its position from closing arguments that Mid-Continent was not a proper party to bring a conversion claim.

We need not resolve the particular disputes identified by the parties, however, because we hold that the issue is more properly characterized as one of standing, which may be raised at any time.

We first note that standing is a jurisdictional issue in Kansas. *Families Against Corporate Takeover v. Mitchell*, 268 Kan. 803, 807, 1 P.3d 884 (2000) (citing *Moorhouse v. City of Wichita*, 259 Kan. 570, 574, 913 P.2d 172 [1996]). Additionally, an objection based on lack of subject matter jurisdiction may be raised at any time, whether it be for the first time on appeal or even upon the appellate court's own motion. *Rivera v. Cimarron Dairy*, 267 Kan. 865, 868, 988 P.2d 235 (1999). The existence of jurisdiction and standing are both questions of law over which this court's scope of review is unlimited. *Schmidtlien Electric, Inc. v. Greathouse*, 278 Kan. 810, 830, 104 P.3d 378 (2005) (jurisdiction); *312 Education Ass'n v. U.S.D. No. 312*, 273 Kan. 875, 882, 47 P.3d 383 (2002) (standing).

As a result, standing is not waivable. See *Tex. Ass'n of Business v. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993) (Standing is a component of subject matter jurisdiction and may be raised for the first time on appeal; it may not be waived by the parties.). Consequently, we agree with the court in *Pace Const. v. Mo. Hwy. & Transp. Com'n*, 759 S.W.2d 272, 274 (Mo. App. 1988), which held:

"The question of standing 'does not relate to the legal capacity to sue, a defense [see K.S.A. 2004 Supp. 60-209(a)] waived unless timely asserted . . . but to the interest of an adversary in the subject of the suit as an antecedent to the right to relief.' [Citation omitted.] Furthermore, standing is said to be, 'in a sense, jurisdictional in limine and so within the notice of a court, even on appeal, for dismissal.' [Citation omitted.] There can be no question that this court does indeed have the power to entertain the issue of standing. The lack of standing cannot be waived. [Citation omitted.] 'Regardless of the merits of appellants' claims, without standing, the court cannot entertain the action.' [Citation omitted.]"

Similarly, the Minnesota Supreme Court held in *State by McClure v. Sports & Health Club*, 370 N.W.2d 844, 850 (Minn. 1985):

"It is well settled that an issue not litigated below may not be asserted for the first time on appeal. [Citation omitted.] However, *an objection to want of 'standing' goes to the existence of a cause of action, is jurisdictional, and may be raised at any time.*" (Emphasis added.) See 59 Am. Jur. 2d, Parties § 363.

For the second part of our determination — that the parties' dispute is actually a standing issue — we look to several cases. In *Guardian Life Ins. Co. of America v. Weisman,* 223 F.3d 229, 238 (3rd Cir. 2000), the Third Circuit Court of Appeals observed that according to both the Uniform Commercial Code (UCC) § 3-420 and the pre-1990 version under New Jersey law, "a drawer has no cause of action against a depository bank for conversion." In *Bank Polska Kasa Opieki v. Pamrapo Sav. Bank,* 909 F. Supp. 948, 953 (D.N.J. 1995), the court granted summary judgment because, among other things, "recent amendments to New Jersey's Uniform Commercial Code clarify that a drawer such as Bank Polska has no standing to sue under § 3-419." The court looked to current § 3-420 as support because it replaces § 3-419 governing conversion claims. See *Continental Cas. v. American Nat'l Bk.,* 329 Ill. App. 3d 686, 697, 768 N.E.2d 352 (2002) (under § 3-420 the issuer of the instrument cannot bring an action for conversion of the instrument); *Ohio Casualty Ins. Co. v. Bank One,* 1996 WL 507292, at *11 (N.D. Ill. 1996) (unpublished opinion) (under § 3-420 of the revised UCC, an action for conversion of an instrument cannot be brought by the issuer of the instrument; accordingly, the township, as the drawer, lacks standing to bring a claim for conversion); *cf. Wymore State Bank v. Johnson Intern. Co.,* 873 F.2d 1082, 1087 (8th Cir. 1989) (whether a drawer can sue a depository bank for conversion is a standing issue).

Although Kansas has no direct UCC cases on this issue, a recent decision from this court supports our standing analysis in the instant case. In *Krider v. Board of Trustees of Coffeyville Community College,* 277 Kan. 244, 83 P.3d 177 (2004), a community college instructor brought an action against the board of trustees contending the board's violation of the Kansas Open Meetings Act (KOMA), K.S.A. 75-4317 *et seq.,* voided a notice of nonrenewal of his teaching contract. The instructor sought reinstatement and

back pay. This court held that under KOMA, as a private citizen he had the authority to seek injunctive and mandamus relief. However, under KOMA, only the attorney general, district attorneys, and county attorneys could seek voidance of governmental action based on violations of the Act. We held:

"When the Board violated the Open Meetings Act, its action was voidable for 10 days. [Citation omitted.] Krider could have persuaded the attorney general or the district or county attorney for Coffeyville to file an action to void the notice. *He had no power to seek that remedy himself. He had standing to sue only for an injunction or writ of mandamus.* He did not. Now it is too late." (Emphasis added.) 277 Kan. at 249.

We hold that because K.S.A. 84-3-420(a) bars an issuer from bringing a conversion action, Mid-Continent had no standing to bring such an action against Capital Homes. Since standing is jurisdictional, Capital Homes' raising the issue for the first time during closing arguments was not too late for it to serve as a basis for the trial court's decision.

Issue 2: *Does K.S.A. 84-3-420(a) bar Mid-Continent's cause of action for conversion of the check when its representative merely acted outside the scope of her authority?*

Mid-Continent next argues that K.S.A. 84-3-420(a) applies only to forgery situations and certainly does not apply to prohibit a claim for conversion when the claim is premised on a signature that simply exceeds the scope of an agent's authority. Mid-Continent contends that to hold otherwise would prevent the drawer from having an adequate remedy to recover the funds from the payor or the payee. In response, Capital Homes relies on the plain language of K.S.A. 84-3-420(a).

In the trial court's memorandum decision of June 30, 2003, denying the motion to alter or amend the judgment, it reviewed the sole authority cited by Mid-Continent in support of these arguments:

"4. Plaintiff asserts that the court's reliance on K.S.A. 84-3-420(a) is misplaced. The reasoning of plaintiff's brief on page three makes sense in that the theory for barring a maker from bringing a conversion claim where a forgery was involved does not apply where, as here, no forgery occurred. If this were a forgery situation, plaintiff could recover from its bank for paying on a forged instrument. Here Ms.

Smith exceeded her actual authority in taking the $50,000 for personal purposes. While there is logic in plaintiff's argument, the authorities do not appear to know for sure what was intended by K.S.A. 84-3-420(a). In J. White & Summers, Uniform Commercial Code (4th Ed. 1995) § 18-4, p. 216 the authors wonder:

> 'But what about the case covered by section 4-307 in which a fiduciary with authority to sign (and by hypothesis not a forger) violates its fiduciary duty and the bank pays the fiduciary in circumstances covered by 3-307(b) (where the bank knows of the fiduciary status and of the breach of the fiduciary duty). Section 3-307 says merely that the bank is 'on notice.' The bank is therefore not a holder in due course, but surely the bank must have some liability to the check's true owner. The most obvious liability is for conversion. As we indicate below, that conclusion causes problems when the injured party is the drawer of the check.
>
> 'We wonder if there can be conversion when the check bears a signature that is not authorized, but is not forged. As we indicate below, a signature by an authorized signer for an unauthorized purpose apparently is not forgery under the Code, but could be part of an embezzlement.'

The discussion goes on to express uncertainty with where the loss should lie in this situation. Clearly the embezzler should have primary liability. The issue here is, as between plaintiff, which authorized Ms. Smith to write checks on its account . . . and therefore put her in the position to embezzle by writing unauthorized checks, and defendant, who took the check in good faith, but with knowledge that Ms. Smith was using plaintiff's funds for a personal purpose, who should bear the loss? The authors of White & Summers says they are uncertain. As this court found in its decision, section 3-307 would make defendant subject to the claims of plaintiff because it cannot be a holder in due course under the facts, but 3-307 does not clarify the legal consequences of denial of holder in due course status. Furthermore, section 3-420(a) says specifically that the drawer has no cause of action in conversion. White & Summers, like this court, expressed uncertainty as to the proper cause of action. Plaintiff presents a logical argument but no case law support directly on point."

Mid-Continent essentially asserts this same argument and authority on appeal. Like the trial court, we reject it. As support, we observe that a number of courts have applied § 3-420(a) as a bar to conversion causes of action in nonforgery cases, including those where an agent has exceeded his or her authority.

For cases concerning an agent's actions merely outside the scope of his or her authority, we first examine *Grand Rapids Auto Sales, Inc., v. MBNA America Bank*, 227 F. Supp. 2d 721. There, without authority, plaintiff's managerial employee wrote checks on its corporate account to defendant bank in payment of her husband's

debt with the bank. After the bank credited the proceeds to the debt, the plaintiff brought suit for, among other things, conversion. The court granted the bank's motion for summary judgment on the basis of § 3-420, holding that plaintiff, as drawer of the checks, was precluded from maintaining a conversion claim. 227 F. Supp. 2d at 730.

In another case involving an agent's lack of authority, *Continental Cas. Co., Inc. v. American Nat'l Bk.*, 329 Ill. App. 3d 686, the plaintiff, GAI, opened a corporate checking account with the defendant bank, ANB. Only three persons were authorized to sign checks. GAI comptroller Cohn, who had no signing authority, instructed GAI to issue nine checks, all of which were duly signed by one of the authorized signatories and made payable to the order of ANB and drawn on GAI's corporate checking account at ANB for the ostensible purpose of paying GAI's payroll taxes. Instead, the comptroller, Cohn, deposited the nine unaltered, nonforged checks ranging in amounts from $44,000 to $50,000 each into an automatic teller machine (ATM), with deposit slips attached for deposit into his own personal account. Cohn absconded with all of the funds, and GAI sustained losses in excess of $370,000.

GAI sued the bank, including a claim for breach of contract. ANB alleged that the action was properly characterized as one for conversion under § 3-420 and therefore time-barred by the statute of limitations, which was shorter than the one for breach of contract. GAI responded that § 3-420(a) "is inapplicable because it does not provide it with a remedy for its losses, since under this section an action for conversion of a check may not be brought by the issuer of the check." 329 Ill. App. 3d at 696. The court held for GAI on this issue, stating that, among other things, § 3-420(a) was "inapplicable because under this section the issuer of the instrument cannot bring an action for conversion of the instrument." 329 Ill. App. 3d at 697.

Similarly, in *Ohio Cas. Ins. Co. v. Bank One*, 1996 WL 507292, at *11, a township supervisor used township funds to open a "secret account," *i.e.*, without authority, then wrote checks on that account to the order of himself as supervisor, and endorsed the checks in the same manner. He then deposited the checks into the secret

account, and transferred those funds into his personal account. The court held that, among other things, § 3-420 barred the conversion action because the township, and plaintiff as its assignee, lacked standing to bring the conversion claim.

For another nonforgery case, but not concerning an agent acting outside of his or her authority, we review *Gr. Lakes Higher Educ. Corp. v. Austin Bank,* 837 F. Supp. 892 (N.D. Ill. 1993). There, the plaintiff, as servicer, issued 224 checks drawn against the funds of First Wisconsin National Bank, payable to the order of various payees. The checks were issued to the payees as loan proceeds pursuant to a student loan application submitted by each. Shortly after the issuance of each check, it was presented for payment to Austin Bank without the endorsement of the named payee. Austin Bank accepted each check for payment from First Wisconsin in the face amount of each check even though the endorsement signature of the payee was not on any of the checks. Because of the checks' lack of proper endorsement, First Wisconsin sued Austin Bank for, among other things, conversion. The court applied § 3-420 which barred the conversion action. 837 F. Supp. at 897-98.

Finally, the United States District Court for the District of Kansas applied 83-3-420 in a nonforgery situation in *IBP, Inc. v. Mercantile Bank of Topeka,* 6 F. Supp. 2d 1258 (D. Kan. 1998). There, plaintiff sued its customer for conversion for having cashed a $135,000 cattle check that had been properly issued and delivered to the customer 9 years earlier. Plaintiff acknowledged, and the court agreed, that plaintiff had no valid UCC claim because under K.S.A. 84-3-420, " '[a]n action for conversion of an instrument may not be brought by . . . the issuer or acceptor of the instrument.' " 6 F. Supp. 2d at 1258.

We acknowledge that in none of these cited cases had the plaintiff, or the court on its own, raised the specific issue advanced by Mid-Continent in the instant case, *i.e.,* that § 3-420 applied only to forgery situations and certainly did not apply when an agent had merely exceeded his or her authority. However, their holdings, particularly when coupled with the lack of any case law supporting Mid-Continent's position, require us to reject its position.

Issue 3: *Did Mid-Continent have a separate, valid claim for conversion of the $50,000 in its bank account?*

Finally, Mid-Continent argues that even if the conversion action for the check is prohibited under the UCC, the action is allowed for conversion of the $50,000 drawn on the check out of Mid-Continent's bank account. It offers no authority for this proposition. We have held that "[s]imply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority or in the face of contrary authority, is akin to failing to brief an issue. 'Where the appellant fails to brief an issue, that issue is waived or abandoned.' [Citation omitted.]" *McCain Foods USA, Inc. v. Central Processors, Inc.,* 275 Kan. 1, 15, 61 P.3d 68 (2002).

Additionally, to the extent Mid-Continent's short argument could be characterized as showing why its point is sound despite a lack of supporting authority, we again look to *Grand Rapids Auto Sales, Inc. v. MBNA America Bank,* 227 F. Supp. 2d 721. There, similar to Mid-Continent's position, Grand Rapids Auto Sales argued that, though it was the drawer of the checks and the court had held the action for conversion of the checks was barred by § 3-420, it was not precluded from maintaining a conversion claim for the funds because its "claim is for conversion of the proceeds of the checks rather than the checks themselves." 227 F. Supp. 2d at 729. The court granted the defendant bank's motion for summary judgment, holding: "This argument must be rejected because the UCC does not draw a distinction between checks and the proceeds received from the checks. *Amzee Corp.* 2002 WL 1012998, at *10." 227 F. Supp. 2d at 730.

Finally, although Capital Homes' response brief argues that its holder in due course (HDC) status under K.S.A. 84-3-302 also provides a defense, we will not address the HDC issue for several reasons. First, Capital Homes did not file a cross-appeal of this adverse ruling by the trial court. It is therefore barred. See *Butler County R.W.D. No. 8 v. Yates,* 275 Kan. 291, 299, 64 P.3d 357 (2003) (K.S.A. 2002 Supp. 60-2103[h] requires an appellee to file a cross-appeal in order to present adverse rulings for appellate

review). Second, given our holdings regarding conversion, the issue regarding holder in due course is moot.

Affirmed.