NOT DESIGNATED FOR PUBLICATION

No. 128,148

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of R.R., a Minor Child.

MEMORANDUM OPINION

Appeal from Johnson District Court; KEVIN MORIARTY and KATHLEEN SLOAN, judges. Submitted without oral argument. Opinion filed June 27, 2025. Affirmed.

*Richard P. Klein*, of Lenexa, for appellant natural father.

*Maria C. Davies*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before WARNER, C.J., CLINE and COBLE, JJ.

PER CURIAM: R.R.'s Father challenges the sufficiency of the evidence supporting the district court's decision to terminate his right to parent R.R. and claims the district court judge erred in failing to recuse herself. Having reviewed the record, we find clear and convincing evidence supports the court's decision. We also find Father's arguments about recusal unpersuasive. Therefore, we affirm the court's termination decision.

FACTUAL AND PROCEDURAL BACKGROUND

When R.R. was two days old, the State initiated proceedings to find he was a child in need of care (CINC). The petition, filed October 14, 2021, contended that R.R. was without adequate parental care under K.S.A. 38-2202(d)(1), was without the care necessary for his physical, mental, or emotional health under K.S.A. 38-2202(d)(2), and had been physically, mentally, emotionally, or sexually abused or neglected under K.S.A.

1

38-2202(d)(3). The petition alleged that Mother had a long history with law enforcement and the Kansas Department for Children and Families (DCF) regarding her three other children. Several reports to DCF showed Mother was often homeless, addicted to methamphetamines, and there were concerns that Mother left her children unsupervised and physically abused them. The petition also alleged R.R. was born testing positive for substances and there were concerns about Mother's drug usage and housing instability. That same day, the district court ordered R.R. to be placed in DCF custody. R.R. was placed with Mother's sister, to whom Mother had given guardianship of her three other children.

The petition noted DCF had contacted Father, who admitted he believed he was R.R.'s father, and that Father agreed to attend court proceedings so paternity could be established. In January 2022, Father's paternity test confirmed he was the father of R.R. Father was offered weekly virtual visits with R.R. as well as in-person visitation.

On May 3, 2022, the State filed an amended petition in which it detailed allegations about Father's behavior since his paternity was established. It also created case plan tasks for Father to complete to ensure safe reintegration of R.R. with Father. The State described Father's aggressive, hostile, and erratic behavior during his virtual visits with R.R., which caused several visits to be cut short. It pointed out that KVC, a child welfare organization that works towards reintegrating children with their parents, felt Father should complete the required case plan tasks he had been given, including undergoing a mental health evaluation, an anger management class, and a parenting class, due to his "hostile, aggressive, and irrational behavior observed through phone calls, emails, visits, and social media posts." The State noted Father had been unwilling to complete the case plan tasks he had previously been given, which also included providing proof of stable housing and employment.

On May 6, 2022, the district court ordered a comprehensive home assessment of Father to be completed by the State of Texas, where Father lived, in accordance with the Interstate Compact on the Placement of Children (ICPC).

On August 4, 2022, the district court held a CINC hearing where the State proffered its case about Mother and presented evidence as to Father. The court adjudicated R.R. as a child in need of care under K.S.A. 38-2202(d)(1), (d)(2), and (d)(3) and ruled that Father be offered a four-month reintegration plan. Father was also ordered to get a mental health assessment, complete a hair follicle drug test, complete anger management classes, participate in a parenting class, follow through with ICPC guidelines, and allow an appropriate Texas agency to complete a home study or walk-throughs as requested, among other tasks.

The State later filed a motion for finding of unfitness and termination of Mother's and Father's parental rights on December 12, 2022.

Before the termination hearing, Father apparently requested via email and orally at a Zoom hearing that Judge Kathleen Sloan recuse herself. None of these requests appear in the record. Judge Sloan issued an order on February 7, 2023, in which she declined to recuse because Father's requests did not comply with K.S.A. 20-311d. Even so, Judge Sloan notified Father at a Zoom hearing on February 22, 2024, that he could file an affidavit asking the Chief Judge in their district for her recusal. Meanwhile, Judge Sloan notified Father that Judge Kevin Moriarty would preside over the termination hearing. Judge Moriarty conducted the pretrial hearing on March 25, 2024, and presided over the termination hearing on March 28 and March 29, 2024.

*The State's Evidence at the Termination Hearing*

The State called several individuals who worked for KVC to testify at the termination hearing. Each person described KVC's unsuccessful efforts to reintegrate Father and R.R. as well as Father's belligerent and aggressive behavior throughout the case.

One of the case managers, Katie Ebbrecht, explained how she offered to arrange in-person visits with R.R. several times at the beginning of the case, but Father was unable to secure transportation. She arranged virtual visits, despite concerns about "multiple aggressive phone calls" with Father about Father's desires for R.R. to be placed with him in Texas.

While the first visit was "very pleasant" and Father appeared to be thrilled at seeing R.R., the next two visits were cut short due to Father's aggressive behavior. Ebbrecht tried to redirect Father and have him focus on R.R. and the visit; however, Father did not calm down and Ebbrecht had to cancel the visit. During other visits, Father would use profane language, call people names, reminisce about being "60-0" in fights with people, and talk about being evicted from his home, wrecking his boss' four-wheeler, and his inability to work. Father also repeatedly accused R.R.'s foster home placement and Mother of being involved with drugs, a meth ring, a biker gang, and a child molester ring. Father claimed that he was beaten up and had cuts on his face because Mother had sent people to attack him. And Father missed visits on April 14, 2022, and May 12, 2022, without notifying anyone.

Outside of visits, there became what Ebbrecht described as increased safety concerns and allegations towards R.R.'s placement by Father. The situation "escalate[d]" and Father continued to send messages about the case. Father frequently complained during visits and stated repeatedly "that placement was raping [R.R.], injecting him with

4

drugs, had a lot of drug affiliated people coming through their home, such as the biker gang. And that [R.R.] was being molested repeatedly, that [R.R.] had been killed by placement and was tossed in a pond or a ditch." Father said that one of the workers supervising the visit molested R.R. Ebbrecht testified that she was concerned about Father's mental health because "he was exhibiting very irrational behavior that did not make sense, that was very aggressive and hostile."

Father's allegations continued. He stated that during the video visits he observed R.R.'s placement raping the child, injecting him with drugs, slamming him around, and that KVC was helping placement. Father reached out to any contact that he had with KVC, DCF, his attorneys, and the FBI with the allegations. But KVC never observed dangerous or concerning behavior between R.R. and his placement.

On April 8, 2022, there was a six-month case plan review. Father was invited but did not participate. Ebbrecht emailed him the case plan and continued to communicate with him after that by email. She also mentioned she had discussed the case plan tasks with Father multiple times telling him what she needed from him and what he needed to start working on. In these conversations, Father would get very aggressive and angry towards Ebbrecht. He would tell her that he did not need to do these things or provide them, and that R.R. should not be in State custody and should be returned to him immediately. Father "would go off on tangents and get sidetracked and it was difficult to refocus him and have any sort of productive conversation."

In May 2022, Father posted concerning social media messages about R.R. being raped and killed and threatened R.R.'s placement that "he was coming to get" R.R. Because of this, placement contacted the police, a welfare check was done, and placement filed a protection from abuse petition. During an emergency review hearing, the district court ordered Father to have no contact with R.R. or with placement. The district court ordered a drug test and a psychological evaluation before continuing visits.

5

Despite Ebbrecht offering to assist Father in finding resources, Father never completed a mental health evaluation, parenting class, an anger management class, medication management, or drug and alcohol evaluation. Father did not provide proof of drug tests because he believed "he was sober and it was unnecessary." Nor did he provide proof of current transportation. The only vehicle of Father's that Ebbrecht knew about was one that Father wrecked when he was driving angry. Father asked people for rides on social media to come up to Kansas because he thought R.R. "was being abused and killed." But Father never asked KVC to help him with transportation for an in-person visit.

In addition to Father's mental health, Ebbrecht expressed further concerns about Father's substance abuse. Father admitted to Ebbrecht that he previously used methamphetamines. She testified that "[h]e had talked many times about the drugs that he had done and done with the biological mother, and his history with it. And based on his continued behaviors I was suspicious that he was continuing to use."

KVC had no contact with Father from about the end of May 2022 until mid-July 2022 because Father was incarcerated in Texas during some of that time. But in mid-July, KVC and Father resumed email communication.

Another KVC case manager, Logan Miller, worked on R.R.'s case with Father from August 2022 until November 2022. Like Ebbrecht, Miller testified about his difficulties in keeping Father focused on case plan tasks that needed to be completed. Miller described how Father would call him names, including "a retard, a moron, an idiot, [and] a bitch-ass Kansas cunt." Although Miller would ignore those comments or attempt to redirect Father, he was still unable to help him find resources to complete case plan tasks because Father would always get off track. At a case plan meeting in November 2023, Father did not ask about R.R. or ask what he needed to work on for reintegration,

6

but instead called another worker names until he was removed from the call so the case plan meeting could continue.

Like Ebbrecht's interactions with Father, no documentation of transportation, completion of the drug and alcohol assessment, parenting class, anger management, or participation in medication management was ever submitted to Miller. These tasks were all designated as part of Father's case plan. Positively, Miller said Father provided him with proof of two jobs, but the jobs were short-term contract work that could not establish the income required to meet the needs of R.R.

Miller also explained that although Father provided a mental health assessment form, KVC had asked for a psychological evaluation. Apparently, the mental health assessment form was a cover page that suggested Father completed an evaluation, but it contained no actual report. The form listed several facilities but did not identify where Father had received the evaluation. Miller called the numbers on the form but could not get in contact with anyone. On October 11, 2022, the district court ordered a new psychological evaluation and ordered Father to submit a hair follicle test. Miller attempted to communicate these changes to Father, but Father would not answer his phone.

Ebbrecht also described her efforts to assist Father in Texas. She sought an ICPC request so that a local worker in Texas could examine Father's home, help him obtain mental health services, and obtain a drug test. KVC's first submitted ICPC for Father was denied by Texas. Furthermore, Father had provided two different leases for two different addresses for the same period and for one of the leases Father provided, the landlord's name on the lease was not the same person who owned the property. Consequently, it was difficult for KVC to establish whether Father maintained a stable home so it could resubmit the ICPC to Texas. KVC resubmitted an ICPC between August 2022 and

7

November 2022. This ICPC was denied after a home study was scheduled with Father and a virtual home study interview was conducted via Zoom on December 4, 2022.

Father's anger and allegations about placement's actions towards R.R. continued to manifest against other KVC workers throughout the case. Celeste Buckner, the KVC intake worker for R.R.'s case, largely ceased involvement in the case in May 2022 because of a series of threatening and conspiratorial messages from Father. On May 8, he emailed Buckner: "[Placement] is doing meth and sodomizing my son again. The male KVC worker that oversees the visit is—that is helping her so he can molest her and the children." Father then implied R.R. could get killed. He texted Buckner, a similar message that night: "[Placement] is doing meth and molesting my son. . . . Get my son out of that child trafficking bitch's hands. . . . [People] fucked my son to death Saturday. You are dead."

With permission from her KVC supervisor, Buckner blocked Father's number. Buckner clarified in her testimony, however, that Father still had the ability to contact his case manager, supervisor, and attorney. Despite blocking Father's number, Buckner checked her voicemail in December 2022 and realized she had a voicemail from a blocked number that was left the month before. The person on voicemail introduced himself with the same first name as Father and identified R.R. by his first name and stated he was his father. He stated, "When you get this, run and hide fucking [inaudible] bitch. Uh, cause you put my son in a child molesting ring up there and I am going to fucking execute you all for it." Buckner confirmed that she identified the caller as Father since she recognized his voice from the other times she had spoken with him. Buckner filed a police report regarding this threat.

Savannah Leaton, a KVC permanency case manager, handled R.R.'s case from January 2023 until July 2023. Leaton told Father what needed to be done for visits to resume. Leaton was concerned that Father responded in a way that conveyed that he was

not going to complete those tasks because Father felt as if he had already completed those tasks. In March 2023, Father emailed Leaton using more profanity. Leaton told Father that he was responsible for getting the tasks set up, and Father responded, "You have to set it up. That is what they fucking told me last time, dumb shit. I have been waiting for KVC since my son was born, you incompetent cunt." When Leaton told Father that his language was not productive, he responded, "You have to set it up and pay for it, retard."

On April 17, 2023, Leaton followed up with Father to check the status of the psychological evaluation and hair follicle test. Father replied, "It was never court ordered." On May 10, 2023, Leaton emailed Father to check on his progress but received no response. A week later, Leaton emailed Father again and attached a copy of his case plan and asked about the psychological evaluation, the hair follicle exam, his lease, pay stubs, and transportation plan. After these contacts in May, Leaton learned that Father entered custody in the Johnson County, Kansas Detention Center and remained in custody at the time of the trial. While Father was in custody, Leaton sent Father a letter in June 2023.

Leaton testified that Father's inaction and apathy for working with KVC continued until she left the case. After the ICPC request was denied, Father never reported any income, or any other addresses, or provided a lease. Father did not provide anything regarding anger management, a parenting class, medication management, or a drug and alcohol evaluation. When Leaton left the case in July 2023, Father still had not done the hair follicle test or the psychological evaluation. Visits were therefore not occurring, and Father had not seen R.R. in two years.

Christine Lenz also testified at the termination hearing. She stated she had supervised all the case managers that testified. Lenz explained that she met with the case managers weekly to discuss issues in cases. In this role, Lenz reported that she sent Father a copy of his ICPC request denial so Father would know Texas' placement

9

concerns with him. Lenz explained that if "an ICPC is denied, we cannot place the child in that state." The denial concluded: "The Department has concerns of [Father's] self-reported marijuana use, aggressive behavior, and extensive criminal history, to include several assault charges."

Lenz confirmed that Father's profanity-laced "intense communication[s]" dated back to August 2022. She reiterated to Father that he needed to get his drug test set up and he must have stable housing. Lenz emailed him because she "received a voicemail from him that was hostile with a lot of profanity." Again, Lenz emailed Father on October 10, 2022, because Father left a voicemail that was "hostile and full of profanity." In three months, Lenz received 17 similar voicemails from Father. When Lenz tried to talk to Father about the tasks he needed to complete, "[h]e never answered any of my questions directly . . . and just kept talking about things that were not related to my questions." On October 17, 2022, Father sent emails about attempts to murder him, drug dealing and murder coverups, child trafficking, and placement abusing R.R. Father also sent an email that said he would "be coming to visit you all personally." Lenz was concerned because it "[s]ounded like a threat and that he would be coming to the KVC office."

On January 30, 2023, Lenz tried a different approach with Father. She reiterated to him that the district court ordered him to get a psychological evaluation and hair follicle test, provided resources, and gave Father a deadline of February 1. Lenz explained that she did this because "he had not completed them previously, and just because we had sent him a voucher to have the hair follicle test paid for. And due to the amount of time substances are in your system, we wanted him to have it completed as quickly as possible." Father responded, "Shut up, Cunt." And in February 2023, Father sent an email stating, "I am coming to get my son." Lenz testified this statement concerned her because Father "previously broke a no-contact order with placement. And with his aggressive behaviors, I was worried for placement and [R.R.]'s safety."

Father's communication led Lenz to believe he was mentally ill. Lenz testified she was not able to diagnose Father as mentally ill, but believed it was "more than possible" that Father suffered from mental illness based on her training and experience as a master's-level social worker, her education, and her work with Father. Lenz stated that "[b]ased on the behavior that I have seen from him in voicemails and emails, and just the dilutions [*sic*] that he has had in letters, it would lead me to believe that" Father had a mental illness.

Despite Father's obscene communications, KVC nevertheless kept in contact with him while he was incarcerated. Father went into custody in Johnson County at the end of May 2023. KVC had communication with Father by sending letters to him at the jail. KVC letters were sent to Father on July 19, 2023, August 1, 2023, October 10, 2023, December 1, 2023, February 22, 2024, and one in March 2024. But Father's communication style did not change whether he was in custody or out of custody. Lenz reported that Father "continued to write about [R.R.] being [in placement], and how they were child molesters and drug dealers, and that he was not safe with them." Father did not ask how R.R. was doing in these letters.

Lenz testified that Father had not completed his case plan or reintegration plan before he went into custody in May 2023. And KVC does not have the ability to send a representative into the jail and take a hair follicle sample or complete a psychological evaluation. She confirmed that during the pendency of the case, Father never traveled up to Kansas until he was brought to Johnson County by law enforcement.

*Father's Testimony at the Termination Hearing*

Father testified that he knew he was R.R.'s father 22 weeks after Mother had been living with him, when Mother called him from jail to tell him "the jail [told her] she was 22 weeks pregnant." Father said he and Mother had last been in a relationship in March

11

2021 but mentioned she continued visiting him after that until he moved out-of-state in September 2021. He said he moved to Texas after Mother "threatened to kill [R.R.] with methamphetamines, and then she threatened to sell him to child molesters." When asked why Father stayed in Texas rather than coming back to Kansas, Father said he was afraid that bikers were going to go after his family in Texas.

Father agreed that he lost his temper with all KVC workers. He explained that "[s]ometimes when I get mad, I get real sarcastic and I cuss people out. It is just—it is a defense, really." For instance, Father wrote Judge Sloan "an insulting letter" at the end of 2023. He referred to it as "the dumb cunt letter." Father said the letter was "comical," "funny," and he was "really depressed," and he guaranteed that after Judge Sloan "got mad, she probably laughed her ass off."

At the same time, Father framed his interactions with KVC in a much different way than the KVC workers did in their testimonies. As to the requirement for drug testing and a psychological evaluation, as soon as they told him about it, Father said he instantly went and tried to do it all himself, but he needed a court order to do it in Texas. And he told the court he took a drug test at "LabCorp" and completed a psychological evaluation at "MHMR." He claimed the KVC case managers only gave him Kansas information or resources. Despite Lenz' testimony, he alleged he never received a voucher to do a hair follicle test. These interactions caused him to grow frustrated with KVC and lose his temper with "all" of them. In reflection, Father admitted he was at fault for how he handled his behavior and actions around KVC but noted he believed he could keep his behavior in check and work with KVC if the court would give him more time. He recognized that his temper was because of his impatience, and he could appreciate after listening to KVC testimony that even though he felt like they were neglecting him, he understood the workers have large caseloads.

Throughout his testimony, Father answered questions about his ability to father R.R. and provide resources for him. When asked where he could live if he got released from custody and R.R. came home with him, Father responded that he was planning to live with his mom, but he could not because of her age. He then discussed how he wanted to move to Missouri and temporarily live with one of his many aunts until he got himself a place. Father said this was his plan even though he had not asked his aunts if he and R.R. could live with them and the only way he might contact them would be through Facebook.

Father testified that he worked in construction and earned enough to support himself and buy a truck two weeks before he was picked up on his pending charge. His plan once released from jail would be to ask construction workers in Linn County, Kansas, if they would give him work. He noted that he has experience taking care of children since he watched nieces and nephews. But when his counsel asked what he would do if R.R. had the flu, Father responded, "Wrap him up in blankets, fix him some warm soup. Try to get him to eat hot and spicy jalapeno juice or jalapenos as I could because it helps break a fever. You have to water it down mostly for kids and infants."

He expressed concern for how placement was treating R.R. Father stated that he thought R.R. was in danger with his placement because "of the threats they have made and the fact that they are responsible for my cousin's murder, and the fact that they tried to kill me." He noted he personally witnessed placement "slapping my son and hit him on my video visits prior to May of 2022, and I filed two CPS cases with CPS. I didn't call KVC. I called CPS directly."

Father also had a chance to discuss his criminal history and incarceration. He admitted that he was in jail in May 2022 and was convicted of interference with law enforcement and acknowledged in another case he pled guilty to possession of methamphetamine. Father stated he went to prison in 2013 for aggravated assault with a

13

deadly weapon and that he had a DUI in 2008. He explained that one pending case he had as being "against a police officer. I slid my cell phone across the top of the car and hit him in his vest. That's all it was. It was a complete accident." Father also had a pending case for violating a protective order and contacting R.R.'s placement. Father conceded he had two warrants out for him in cases in Kansas and Missouri and at the time of the termination hearing, Father was in custody in Johnson County for criminal threat. While Father had been in and out of custody throughout the case, Father admitted that he was out of Kansas and Texas custody from the time R.R. was born in October 2021 until May 2022.

*The District Court's Findings and Order*

After taking a recess, the district court returned to deliver its decision. It found that Father was unfit, his conditions of unfitness were unlikely to change in the foreseeable future, and it was in R.R.'s best interests to terminate Father's parental rights. It based these findings on many statutory factors of unfitness under K.S.A. 38-2269, including:

- K.S.A. 38-2269(b)(1): "Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child."
- K.S.A. 38-2269(b)(7): "[F]ailure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family."
- K.S.A. 38-2269(b)(8): "[L]ack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."
- K.S.A. 38-2269(b)(9): "[W]hether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home."

- K.S.A. 38-2269(c)(3): "[F]ailure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

At the termination hearing, the district court provided some context for its decision to rely on these factors. It noted that Father knew Mother was pregnant with R.R. and knew she was using methamphetamine while pregnant. But Father nevertheless engaged in behavior which caused him to be incarcerated on many occasions and, even when he was not in custody, he decided to stay in Texas and not visit R.R. in person.

The district court emphasized to Father that he had a case plan which every case worker shared and discussed with him, yet "29 months later, the entire life of [Father's] child, they are still not done." Rather than letting KVC help him, the court found that Father would lose control, get angry, threaten people, and publicly talk about R.R.'s alleged death. Ultimately, the court found by clear and convincing evidence that Father was unfit and there was "a mental issue that probably keeps" Father from getting help. It believed he was emotionally unstable, lived a life full of drama, and was consistently in and out of jail. And because of this, most importantly, it did not know how Father could expect to provide stability for R.R. when Father has not been stable himself. Since Father showed no aptitude to complete tasks, the court also determined that Father's circumstances were unlikely to change in the foreseeable future.

This appeal follows.

REVIEW OF FATHER'S APPELLATE CHALLENGES

I. *Did the district court judge err in failing to recuse?*

Father first argues Judge Sloan should have recused herself from the case based on the Judicial Code of Conduct and due process concerns. He believes she "made numerous

decisions and orders during the case that could be seen as biased" against him. Kansas appellate courts exercise de novo review over whether a district judge's recusal is required. *State v. Moyer*, 306 Kan. 342, 369-70, 410 P.3d 71 (2017).

To begin, Father's argument that Judge Sloan erred in failing to recuse herself from the case is unpreserved for appellate review. In *In re Marriage of Bush*, 62 Kan. App. 2d 284, 513 P.3d 494 (2022), the appellant argued the district court had a conflict of interest throughout the proceedings. This court noted:

> "A litigant may argue that a judge's recusal is required in accordance with (1) the statutory factors set forth in K.S.A. 20-311d(c); (2) the standards of the Kansas Code of Judicial Conduct, Supreme Court Rule 601B, Canon 2, Rule 2.2 (2022 Kan. S. Ct. R. at 495); and (3) the Due Process Clause of the Fourteenth Amendment to the United States Constitution.
>
> "A party or a party's attorney may move for a change of judge based on the belief 'that the judge to whom an action is assigned cannot afford that party a fair trial in the action.' K.S.A. 20-311d(a). 'Under K.S.A. 20-311d, a party must first file a motion for change of judge; if that motion is denied, then the party must immediately file a legally sufficient affidavit alleging grounds set forth in the statute.' Moreover, our Supreme Court has refused to consider bias claims on appeal when the claimant has failed to follow the proper statutory procedure, concluding that a claimant's failure to file an affidavit barred it from evaluating the judicial bias claim. [Citations omitted.]" 62 Kan. App. 2d at 291-92.

This court ultimately declined to consider the appellant's judicial bias claims because there was nothing in the record showing the appellant followed the statutory procedure by filing an affidavit setting forth his allegations of judicial bias. 62 Kan. App. 2d at 291-92. The same conclusion is appropriate here.

Father admits he did not file an affidavit with the district court as required by K.S.A. 20-311d. While he does not address *In re Marriage of Bush*, he contends he can

still raise arguments under the Kansas Code of Judicial Conduct and due process. He contends Judge Sloan should have recused herself because the Kansas Code of Judicial Conduct requires a judge to perform their duties impartially and requires the judge to disqualify herself "in any proceeding in which the judge's *impartiality* might reasonably be questioned." Kansas Supreme Court Rule 601B, Canon 2, Supreme Court Rule 2.11(A) (2025 Kan. S. Ct. R. at 489). He also cites *State v. Hurd*, 298 Kan. 555, 570, 316 P.3d 696 (2013), for the proposition that "[r]ecusal is required under the Fourteenth Amendment's Due Process Clause when the judge is actually biased or there is a constitutionally intolerable probability of actual bias." Although we find his arguments unpreserved under *In re Marriage of Bush*, we will explain why we also find them unpersuasive.

To begin, Father does not identify any decisions made by Judge Sloan which he contends demonstrated bias or prejudice against him. Instead, he points to his testimony at the termination hearing that he tried to get the judge off the case and that they had been "butting heads" and two remarks by Judge Sloan at a hearing on October 11, 2022: (1) "And I agree with you that he's impossible to work with" and (2) "I think he has a mental health issue. I don't think it's substances. I think it's mental health." Yet he fails to explain how these statements show Judge Sloan was partial or how her alleged bias impacted any decision she made in his case. And, most importantly, Judge Sloan did not preside over Father's termination hearing. Judge Moriarty conducted the pretrial hearing and the termination hearing.

Another problem with Father's argument is that he fails to appreciate the context of Judge Sloan's comments. For instance, when Judge Sloan stated, "And I agree with you that he's impossible to work with," she made this comment directly after Father's counsel requested to withdraw from the case. Father's counsel explained:

17

"Judge, I guess what I would like to ask the Court to do—I know I'm only standby counsel at this, but, you know, in dealing with [Father], I have had nothing but threatening phone calls. He has made lots of threats against me. He has done nothing but call me vulgar, violent names. He has referred to me as a rapist, as a child molester, in addition to lots of other things, things I don't even want to mention. You know, he's made threats against me, indicating that I'm being reported to the FBI, I'm being investigated by others, I'm going to end up in jail. He thinks I'm—lots of allegations against me that are, obviously, unsubstantiated. He's just a very difficult man to even communicate with, let alone work for."

Judge Sloan articulated that she understood Father's counsel's position because Father was hard to work with. Father's counsel responded, "Judge, it's hard to work for somebody who continues to threaten you." She consequently decided she would have to appoint a different counsel for Father. The full context of Judge Sloan's statement demonstrates that she understood Father's threatening actions towards counsel and could appreciate the difficulty of working with Father given his comments and actions. Judge Sloan did not make this statement while judging, for example, Father's ability to parent R.R. She asserted this comment as a response to Father's counsel's request to withdraw.

Similarly, context for Judge Sloan's statement, "I think he has a mental health issue. I don't think it's substances. I think it's mental health" shows she was not biased or prejudiced against Father. Directly before she made this statement, the State's attorney stated:

"I do think we have some things we need to address for sure regarding [Father], because even though there is so much inappropriate conversation—I mean, veiled threats, direct threats—there's clearly—I mean, [Father] clearly believes that horrible things are happening to this child based on nothing. And so, obviously, that causes a lot of concern about his mental health or substance use.

"He has submitted two [urinalysis samples], kind of on his own schedule, and they were both clean. So I think the Court needs to order a hair follicle so we can figure out if that's the issue."

When read in context, Judge Sloan's comment does not show she was biased or prejudiced against Father. Rather, the comment demonstrates Judge Sloan wished to respond to the State's statement that there is "a lot of concern about his mental health or substance use." In attempting to address Father's apparent issues, as talked about by Father's counsel earlier in the hearing, Judge Sloan stated she believed Father's problems were related to his mental health and not substance abuse. If anything, Judge Sloan's statement shows she was working on identifying and ruling out challenges Father may encounter in reintegrating with R.R. And later in the hearing, Judge Sloan ordered Father to complete a new mental health evaluation and a hair follicle test. As the State correctly argues, if Judge Sloan was biased against Father, she would not have given him the opportunity and time to complete these tasks.

We therefore find no error in Judge Sloan's actions, nor do we find that Father has shown the actions he challenges establish that Judge Sloan was biased or prejudiced towards him.

II. *Were the district court's rulings that Father was unfit to parent R.R. and that unfitness is unlikely to change in the foreseeable future supported by clear and convincing evidence?*

Father secondly argues that the district court erred in finding he was unfit to father R.R. and that unfitness is unlikely to change in the foreseeable future. He does not challenge the district court's decision that termination was in R.R.'s best interests.

A. *Standard of review*

"When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a).

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). An appellate court cannot "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 311 Kan. at 806.

B. *The district court's conclusion that Father was unfit to parent R.R. was properly supported.*

The district court found Father unfit to parent R.R. based on K.S.A. 38-2269(b)(1), (b)(7), (b)(8), (b)(9), and (c)(3). Father asserts the court's findings are not supported by clear and convincing evidence.

1. *K.S.A. 38-2269(b)(7) and (b)(8)*

On appeal, Father's first argument relating to the district court's findings on his unfitness is "KVC's supposed efforts to unify the family were anything but reasonable." Although Father asserts a few different conclusions regarding the reasonableness of KVC's efforts to reunify Father and R.R. under K.S.A. 38-2269(b)(7), he does not make any argument related to his effort to adjust his circumstances to meet the needs of R.R. under K.S.A. 38-2269(b)(8). Any argument about the district court's decision to find Father unfit under K.S.A. 38-2269(b)(8) should therefore be considered waived or

20

abandoned. When a party fails to brief an issue, that issue is deemed waived or abandoned. *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 191, 106 P.3d 483 (2005). In any event, KVC's efforts to rehabilitate the family and Father's absence of effort to meet the needs of R.R. are both assessed below.

Father contends KVC failed to make reasonable efforts to rehabilitate the family because: KVC never "attempted to get a hair follicle test done or a psychological evaluation"; "nobody from KVC even visited the father in jail—not once"; KVC's "level of effort was zero"; and "KVC case managers never gave [Father] information or resources to get things done in Texas." These arguments are incorrect, misleading, or unavailing.

First, the record shows people at KVC tried to get Father to complete his hair follicle test and psychological evaluations many times. Several KVC workers testified about their efforts to notify and remind Father of these requirements, and Lenz explained KVC sent Father a voucher to have the hair follicle test paid for. They also explained that Father did not answer their emails or letters or responded that these tasks were not court-ordered.

"The language in K.S.A. 2019 Supp. 38-2269(b)(7) imposes an obligation upon the relevant social service agencies to expend reasonable efforts toward reintegrating the child with his or her parents." *In re A.P.*, No. 121,913, 2020 WL 3022868, at *10 (Kan. App. 2020) (unpublished opinion). The requirement exists to provide a parent with an opportunity to succeed, but to do so requires the parent to exert some effort. *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019). K.S.A. 38-2269(b)(7) requires KVC to expend reasonable efforts to get Father to reintegrate with R.R., like trying to have him complete the hair follicle test and psychological evaluation. But Father is also required to exert some effort to complete these tests.

21

Now, Father testified that he completed a psychological evaluation at "MHMR." But KVC workers testified Father only provided a cover page that reflected that Father completed an evaluation without providing any actual report. And the assessment did not indicate where Father received the evaluation. In making its ruling, the district court found this evidence was insufficient to show Father had completed the required psychological evaluation. We cannot reweigh this evidence on appeal. *In re D.J.B.*, No. 122,333, 2020 WL 4032849, at *4 (Kan. App. 2020) (unpublished opinion); see *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Second, although Father is correct that KVC did not visit him in jail, he provides no authority showing it had to do so. Despite Father being in custody, KVC still made reasonable efforts to contact him. Father went into custody in Johnson County at the end of May 2023. KVC communicated with him by sending letters to him at the jail on July 19, 2023, August 1, 2023, October 10, 2023, December 1, 2023, February 22, 2024, and one in March 2024. And it continued to pursue its efforts to have Father reintegrated, even while he was in custody. If an appropriate agency makes reasonable efforts to support a father, and "the agency's efforts were limited due to Father's incarceration," that does not mean "the agency did not make reasonable efforts." *In re C.H.*, No. 125,871, 2023 WL 4994412, at *5 (Kan. App. 2023) (unpublished opinion).

Third, Father's assertion that KVC made "zero" effort to reintegrate him with R.R. is also incorrect. Ebbrecht testified that even before Father's paternity was established, she began working with Father. She explained to him "the process and what case plans would look like if and when paternity is established." She set up an initial case plan and a six-month case plan review (Father attended neither), the two had regular phone contact and spent time walking through KVC's visitation guidelines, and she reviewed and discussed Father's reintegration tasks with him multiple times, emailed him the case plan, emailed him about the district court's drug test and psychological evaluation orders, and set up many virtual visits between Father and R.R. Ebbrecht also offered to plan meetings

22

between Father and R.R. if Father chose to come to Kansas and visit R.R. in person (which Father never did).

The other KVC workers also testified about their efforts to communicate with Father and his unproductive responses. Despite Father's obscene communications, KVC nevertheless kept in contact with him and worked with Father consistently and diligently to try to get him to complete case plan tasks. The district court "do[es] not require proof that the appropriate agencies made a herculean effort to lead the parent through the responsibilities of the reintegration plan." *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App. 2015) (unpublished opinion).

Fourth, Father is also wrong that KVC failed to assist him while he was living in Texas. KVC worked with Father via phone calls, email, and video calls. KVC also worked to secure an ICPC placement so Father could have a local case worker in Texas that could assist him. After both ICPC requests were denied, KVC sent Father a copy of his ICPC denial so Father would know Texas' placement concerns with him. The record shows KVC made reasonable efforts to secure local resources for Father in Texas. KVC gave Father a chance to succeed in Texas and not only did he fail to meet the minimum requests, but he actively harmed his chances by behaving aggressively.

Father's argument that KVC failed to make reasonable efforts to support him is unpersuasive. Similarly, Father's inability to accomplish tasks like completing a drug test, psychological evaluation, parenting class, anger management class, steps necessary for a successful ICPC placement, and attending case plan meetings demonstrated he lacked effort to adjust to his circumstances and conditions to meet the needs of R.R.

23

*2. K.S.A. 38-2269(b)(1)*

Father also argues the district court erred in finding Father unfit under K.S.A. 38-2269(b)(1). He believes the court made no factual findings about Father's emotional illness, mental illness, mental deficiency, or physical disability. He contends there was no evidence presented that would allow a finding under this factor and that while he did call KVC workers names, that was only because he was frustrated and worried about placement's care of R.R.

Father is wrong that the district court made no factual findings about his mental illness. The court stated:

"The Court does find that you are unfit, that you have shown a pattern of behavior, and this is all by clear and convincing evidence. In fact, it could be a much higher standard. And that I believe, based upon my 45 years of doing work like this, and my three years of doing criminal and court services work before, that there is something—that you do need some help. And I wish you had been given it a long time ago. That there is something—a mental issue that probably keeps you from doing this."

And the State also presented evidence to show Father was mentally ill. Most prominently, Lenz testified that Father's communication led her to believe Father was mentally ill. Lenz testified she was not able to diagnose Father as mentally ill, but believed it was "more than possible" that Father suffered from mental illness based on her training and experience as a master's-level social worker, her education, and her work with Father. Lenz stated that "[b]ased on the behavior that I have seen from him in voicemails and emails, and just the dilutions [*sic*] that he has had in letters, it would lead me to believe that" Father had a mental illness.

The district court did not provide its calculus for what evidence showed Father was mentally ill. But a review of the record shows this conclusion is highly probable—

24

i.e., supported by clear and convincing evidence. Ebbrecht testified that based on Father's aggressive and hostile behaviors she had witnessed, she "was concerned about a potential mental health problem." Ebbrecht agreed that Father's behavior was "erratic," "[a]ll over the place," and "[u]p and down." Testimony also reflected that Father expressed irrational fears that were not based in reality.

While some cases show that when a parent was ruled unfit under K.S.A. 38-2269(b)(1), an expert witness like a psychologist testified, Father does not point to any authority showing this is required. See *In re B.J.*, No. 125,727, 2023 WL 5320946, at *3-5 (Kan. App. 2023) (unpublished opinion) (noting a psychologist testified at the termination hearing where the district court found a parent unfit under K.S.A. 38-2269[b][1]); see also *In re L.S.*, No. 126,731, 2024 WL 4314703, at *3 (Kan. App. 2024) (unpublished opinion) (affirming the district court's decision to find a parent unfit under K.S.A. 38-2269[b][1] because the parent had "erratic behavior and statements [that] also indicated she suffered from serious mental health issues").

Clear and convincing evidence shows that Father had an emotional illness, mental illness, mental deficiency, or physical disability. We therefore see no error in the district court's decision to base its finding of unfitness on this statutory factor.

### 3. *K.S.A. 38-2269(c)(3)*

Father lastly argues the district court erred in finding him unfit under K.S.A. 38-2269(c)(3) because his reintegration plan was unreasonable. He asserts two contentions—Father's reintegration plan was not directed at correcting the conduct and conditions that resulted in the removal of R.R. and because the court entered a no-contact order, Father's chances of reuniting with R.R. were "destroyed."

25

First, Father's argument that his reintegration plan was not directed at correcting the conduct and conditions that resulted in R.R.'s removal is conclusory. Father does not explain this statement and express what conditions that resulted in removal were unaddressed in the reintegration plan. He fails to articulate any substantive argument on this issue besides his conclusory statement. Issues not adequately addressed in briefing are treated as waived or abandoned. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021). Without knowing what parts of the reintegration plan Father believes to be unreasonable, we cannot adequately address what he is referring to.

Second, Father fails to recognize that the court's no-contact order did not permanently disable him from communicating with R.R. The no-contact order stated: "[T]he Court orders that visits between the child and the father are suspended until the father submits regulars [urinalysis samples] and completes a psychological evaluation." Father still had the ability to reintegrate with R.R. and communicate with him if Father submitted regular urinalysis samples and completed a psychological evaluation. At the termination hearing, Ebbrecht explained what led to the no-contact order:

> "Very concerning social media posts about [R.R.] being raped and killed, and threats towards placement that he was coming to get [R.R.]. Placement was in fear of their safety and filed a [protection from abuse order] with the police department against [Father]. There was a welfare check where the Osawatomie Police Department sent an officer to investigate. I received a picture of the officer holding [R.R.]. And that continued threats prompted an emergency hearing with Judge Sloan on May 16th where she ordered a UA, a urinary test, and a psych evaluation before continuing any visits. And she put a no-contact order in place between [Father] and [R.R.] and [Father] and placement."

Father's fears, threats, and comments were so concerning law enforcement became involved. It was Father's behavior, which led to the no-contact order, that created the barriers to reintegration with his son. And the court still permitted him to eliminate the

no-contact order if he met two reasonable requests. Father's argument that the no-contact order destroyed his chances of reintegration is unavailing.

Father also briefly mentions that "because he was not unfit for failing to carry out a reintegration plan, the father cannot be unfit under K.S.A. [] 38-2269(b)(9), which requires one of the subsections from K.S.A. [] 38-2269(c) to apply." But K.S.A. 38-2269(c)(3) does apply and Father fails to make an argument that the district court otherwise incorrectly concluded Father was unfit under K.S.A. 38-2269(b)(9).

4. *The district court's conclusion that Father's unfitness is unlikely to change in the foreseeable future was properly supported.*

As a final matter, Father argues the district court erred in finding that his unfitness was unlikely to change in the foreseeable future. In making a ruling on Father's ability to parent R.R. in the foreseeable future, the district court stated:

"And what's happened is, is that, as a result, you are unfit as a parent. And because of this, of all these things I said, I don't see any foreseeability that until you address some of your own issues that you are going to be able to help a child. Not only for that foreseeability, you've about flattened your time here, you still have something left to do and I don't know how much. It might be a little, it might be a lot. But you have to admit since 2014, based upon your testimony, it's been a—you have been in and out of jail. And it seems like a lot of them are, quite frankly, behavior that was discussed by these caseworkers. It is—you can't get out of your way.

"And so I can't see how there's any—and that's the biggest hang-up of this whole thing is is there a reasonable foreseeability? There isn't. I want to give you every benefit of the doubt, and I did. Could this happen? Could this happen? Could this happen?

"But because you have not been able to find your own stability, I can't see where you are going to be able to provide at any time certain for your child. And I know that at the same time that your child is almost two and a half and he doesn't—he doesn't know you and he needs permanency. And that it is in his best interest that that be found."

27

Father believes this is the wrong conclusion because it "ignores the clear progress the father could have made in the case when released from jail." Specifically, he believes the fact that he had a job lined up, he had taken care of other children before, and he was good with R.R. during their visits, means his unfitness would change in the foreseeable future. This is incorrect.

Although Father maintains he had a job lined up post-incarceration, the record does not show Father's ambitions were realistic. Father merely testified about his expectations for work without providing any concrete details. Indeed, Father did not even confirm that he had talked to anyone about a job—he merely expected it would be provided. This is problematic because it appears Father's work, and therefore his ability to support R.R., was spotty throughout the case. For instance, many times during the case, he was asked if he could submit pay stubs to prove income, but it appears he never did so.

Also, Father's argument concerning his behavior surrounding his visits is similarly incorrect. Although the first visit was "very pleasant" and Father appeared to be thrilled at seeing R.R., the second visit only lasted about 15 minutes because Father "was out of the gates aggressive and trying to talk about the case" and about Mother. Other visits also ended early due to Father's behavior. And he missed visits without notifying anyone. The court was reasonable in considering this past conduct as an indicator of future behavior. See *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion) ("Parental unfitness can be judicially predicted from a parent's past history.").

Despite his testimony that he has experience taking care of children since he watched nieces and nephews, that does not solve Father's mental health issue that plagued the case and contributed to the district court's ruling on his unfitness. Even assuming Father was an excellent uncle to his nieces and nephews and had good, insightful

28

experience taking care of them, this positive history cannot address or fix the mental health issues Father repeatedly demonstrated throughout the case.

Based on this record, we find that clear and convincing evidence supported the district court's determinations that Father was unfit to parent R.R. under K.S.A. 38-2269(b)(1), (b)(7), (b)(8), and (c)(3) and that Father's unfitness is unlikely to change in the foreseeable future.

Affirmed.